# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

ROBERT B. PURVIS,                      :

     Plaintiff,                         :

                                             Case No. 3:10cv00331

 vs.                                   :

                                             District Judge Thomas M. Rose

MICHAEL J. ASTRUE,                     :     Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,               :

     Defendant.                         :

## REPORT AND RECOMMENDATIONS[1]

## I.  <u>Introduction</u>

Plaintiff Robert B. Purvis brings this case challenging the Social Security Administration's denial of his applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). This Court has jurisdiction to review the administrative denial of his applications. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #11), the administrative record (Doc. #7), and the record as a whole.

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff asserted in administrative proceedings that he is eligible to receive DIB and SSI because he is under a "disability" within the meaning of the Social Security Act. In the present case, Plaintiff seeks a reversal of the ALJ's decision or, at a minimum, a remand of this case to the Social Security Administration for proper evaluation of medical source opinions. The Commissioner contends that an Order affirming the ALJ's decision is warranted.

## II.  Background

### A.  Procedural History

Plaintiff filed his SSI and DIB applications in November 2006[2], asserting that he has been under a "disability" since November 18, 2005. *Page ID##* 189-91, 192-96. Plaintiff claimed to be disabled by manic psychotic bi-polar disorder and schizophrenia. *See Page ID#* 267.

Following initial administrative denials of his applications, Plaintiff received a hearing before Administrative Law Judge (ALJ) Thaddeus J. Armstead Sr.  ALJ Armstead later issued the written decision concluding that Plaintiff was not under a disability, and, therefore, not eligible to receive DIB or SSI.  *Page ID##* 53-68.

---

[2] Plaintiff filed prior applications for benefits which were denied at the hearing level on April 7, 2006.  (*Page ID##* 82-84, 134-136, 219).

## B.    Plaintiff's Vocational Profile and Testimony

Plaintiff was 43 years old on the date the ALJ issued his decision, which defined him as a "younger individual."  *See* 20 C.F.R. §§ 404.1563; 416.963[3]; *see also Page ID ## 66, 217.*  Plaintiff has a high school education, *see* 20 C.F.R. § 404.1564(b)(4), *see also Page ID# 226*, and past relevant work experience as a computer-operated cutting machine operator, surface grinder operator, external grinder operator, and internal grinder set-up operator.  *Page ID## 66, 223.*

Plaintiff testified at the administrative hearing[4] that he could not work because "I'm told I'm bipolar."  *Page ID# 87.*  He "felt that people were putting drugs in my food and they come into my house when I leave my house, people come into my home and do things to my house."  *Id.*  Plaintiff stopped working because of these thoughts, and then "they came and got me and put me in the, the hospital for 21 days."  *Id.*  Plaintiff further testified that since he was released from the hospital, he had been "seeing a doctor that's told me that I'm not to work.  They put me on all this medication and I, all I do is lay around because that medication makes me all lethargic."  *Page ID## 87-88*

Plaintiff asserted that doctors from Eastway kept him from working and told him to file for disability.  *Page ID## 88-89.*  He did not think that the doctors at Eastway "treat me with respect," and thought he "was getting jerked around."  *Page ID# 89.*  He

---

[3] The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI/DIB Regulations.

[4] Because the alleged errors raised by Plaintiff do not implicate the vocational expert testimony also presented at the administrative hearing, the Court has not summarized that testimony.

explained, the doctors "make me take this medication," and make it sound "like they could throw me in the mental ward if I didn't do what that doctor said so I do what that doctors says." *Page ID#* 88.

When questioned by his attorney, Plaintiff explained that he does not hallucinate, except for when people put drugs in his food. *Page ID#* 94. He also stated that people do things to his house when he is away. *Id.* Plaintiff testified that due to his medication, he sleeps ten or twelve hours per day, but does not claim to experience any other side effects. *Page ID#* 97. Plaintiff also testified that he takes his medication everyday. *Page ID#* 98. In addition, Plaintiff believes that there are cameras in his house, and "can only assume it's the government [that installed the cameras]." *Page ID#* 99.

Plaintiff testified that he rode the bus, and had not gotten into any arguments with anyone on the bus. *Page ID##* 99-100. He also stated that he had not used marijuana since 2006, when he was released from the hospital and entered rehabilitation. *Page ID##* 100-01. Plaintiff explained that he has a driver's license and a car, and is able to drive to the grocery store and buy groceries by himself. *Page ID##* 101-102.

Plaintiff's father, David Purvis, also testified at the administrative hearing. Mr. Purvis testified he usually sees Plaintiff at least two times a month, typically to pick up bills. *Page ID##* 107-08. Mr. Purvis noted that Plaintiff was "very paranoid," had no friends, or social contact with anyone - "I mean nobody." *Page ID#* 109. Mr. Purvis stated that Plaintiff continues to think that people are putting things in his food and water, and does not leave his house. *Page ID##* 109-10. When Plaintiff's parents would take

him to a restaurant, he would "order a bottle of water or something with the meal and still swear up and down it had something in it." *Page ID#* 110. Mr. Purvis did not believe his son was drinking alcohol any longer because, as stated: "I can't see anything in his trash. If I happen to lift the lid, I don't see bee bottles all over the place. Every time I call and talk to him on the phone, he sounds, sounds really good, not like that." *Page ID##* 114-15. Mr. Purvis further testified that in the past Plaintiff claimed he had special powers and the government was using him for experiments. *Page ID#* 116.

C.    **Medical Source Opinions**

**Timothy Todd, M.D./Eastway Behavioral Healthcare**

Following a 10 day hospitalization in the Psychiatric Intensive Care Unit at Good Samaritan Hospital in August 2003, *see Page ID##* 275-83, 574-94, Plaintiff began seeing Timothy Todd, M.D., a psychiatrist at Eastway Behavioral Healthcare (Eastway), on August 25, 2003. *Page ID##* 318-19. Dr. Todd reported that Plaintiff was alert, oriented, pleasant, and cooperative, with a "mildly suspicious and blunted" affect. *Page ID#* 318. Thought processes were logical, coherent, and goal directed, with no psychotic symptoms. *Id.* Dr. Todd diagnosed Plaintiff with Bipolar I Disorder, Most Recent Episode Manic, Severe, with Psychotic Features, In Remission; History of Cannabis Abuse; and Alcohol Dependence, In Early Partial Remission. *Page ID#* 319. Plaintiff

was assigned a GAF score of 50 to 55[5]. *Id.* Dr. Todd recommended that Plaintiff continue taking Depakote and Seroquel. *Id.*

In November 2003, Dr. Todd completed a Mental Functional Capacity Assessment form for the local county Department of Job & Family Services. In the twenty areas of functioning, Dr. Todd found Plaintiff was "not significantly limited" in seven areas, and was "moderately limited" in thirteen areas; he did not find Plaintiff to be "markedly" or "extremely" limited in any areas. *Page ID##* 385-87. Dr. Todd listed Plaintiff's diagnoses as Bipolar I Disorder with Psychotic Features, in remission, and Alcohol Dependence, in partial remission. He concluded that Plaintiff was "unemployable," and would remain so for 12 months or more. *Page ID#* 386.

Plaintiff saw a psychiatrist, and a case manager/community support specialist regularly through September 2005. *Page ID##* 303-19, 509-45, 566-67. In December 2003 and March 2004, Plaintiff reported compliance with and tolerance of his medications, and denied any overt symptoms of depression, mania, or psychosis. *Page ID ##* 310-11, 312-13. Dr. Todd noted Plaintiff's overall condition as "stable," from April 2004 through May 2005. *Page ID##* 303-07. Through May 2005, Plaintiff

---

[5]Health care clinicians perform a Global Assessment of Functioning to determine a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Hash v. Comm'r of Social Security*, 309 Fed. Appx. 981, 988 n.1 (6th Cir. 2009); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34. A GAF score of 51-60, refers to "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.

reported he took medications as prescribed with no side effects, no hallucinations, nor delusions. *Page ID##* 509-43.

In September 2005, Plaintiff was stabilized, working full-time, and taking medications as directed. *Page ID##* 569-604. After his return to work, Plaintiff did not follow up with mental health treatment.

**Maria L. Weber, Psy.D.**

Following a 21 day hospitalization that was initiated after Crisis Care "pink-slipped" Plaintiff and he was brought to Good Samaritan Hospital by the Dayton Police Department, *see Page ID##* 406-38, Plaintiff saw psychologist, Maria L. Weber, Psy.D. on October 18, 2006, through the Lifewell Program, an intensive outpatient, or "Partial Hospitalization" program, aimed at stabilization and prevention of further psychiatric admission. *Page ID#* 457. Plaintiff felt anxious and isolated, but denied paranoid thoughts, delusions, or hallucinations. Dr. Weber reported Plaintiff "made several statements indicative of paranoid, delusional thinking," and displayed poor insight into his mental illness. *Id.* While at Lifewell, Plaintiff saw Dr. Weber, as well as Otto Dueno, M.D., a psychiatrist, weekly until his discharge on November 21, 2006. Upon discharge Plaintiff was considered stable enough for less intensive mental health treatment. *Page ID##* 442-62. Plaintiff's diagnoses included Bipolar I Disorder Manic, with Psychosis; Alcohol Dependence; and Cannabis Abuse. *Page ID#* 454.

Dr. Weber completed a Mental Functional Capacity Assessment form on November 10, 2006. *Page ID ##* 440-41. According to Dr. Weber, Plaintiff was

extremely limited in his ability to complete a workday/workweek without psychological interruptions; to perform at a consistent pace without an unreasonable number and length of rest periods; and to set realistic goals or make plans independently of others. *Page ID#* 440. Additionally, Plaintiff was determined by Dr. Weber to be markedly limited in his ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine, without special supervision; work in coordination with or proximity to others without being distracted by them; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and be aware of normal hazards and take appropriate precautions. *Id.* Dr. Weber concluded Plaintiff was unemployable for at least 12 months. *Page ID#* 441.

## **Ampara Wee, M.D./Eastway**

In compliance with court-ordered Outpatient Commitment, and after discharge from Good Samaritan's Lifewell Program, Plaintiff returned to Eastway, for outpatient mental health services. *Page ID#* 508. About every two to three months from November 2006 to April 2008, Plaintiff saw Dr. Wee regularly for medication management. *Page ID ##* 287-300. Plaintiff reported taking medications as prescribed, did not report any side effects, regularly denied mood instability, delusions, paranoia, substance use, or hallucinations. *Page ID##* 289-90.

In May 2007, Plaintiff was anxious, argumentative, and continued to deny mental health symptoms or limitations. *Page ID##* 498-99. Dr. Wee noted that Plaintiff was irritable, tense, and continued to display paranoid thoughts. *Page ID#* 495. By July 2007, he told his case manager that treatment was a waste of time and, in September 2007, just wanted to "be left alone." *Page ID##* 491-92. Also in September 2007, Plaintiff told Dr. Wee that he was "doing great." *Page ID#* 490. In November 2007, Plaintiff was hostile, argumentative and resisted further contact. He told a case manager, "[d]on't you dare say I refused, I'll come sign your little forms, Junior." *Page ID#* 489.

**Mariella Toca, M.D./Eastway**

Through June 2008, Plaintiff continued to deny psychological symptoms, insisted he took medications as prescribed, and professed Eastway was a "waste of time." *Page ID##* 483-85.

On July 3, 2008, Plaintiff began treatment at Eastway with psychiatrist, Mariella Toca, M.D. *Page ID#* 480. Plaintiff told Dr. Toca he did not want to see her every three months. *Id.* Dr. Toca reported that Plaintiff was irritable, confrontational, and challenging. *Id.*

On September 5, 2008, Plaintiff told his case manager that he did not need services but, he would continue to meet monthly to "inconvenience you until you all get what you deserve." *Page ID#* 479. Plaintiff was angry, confrontational, and had no interest in treatment. He denied any psychological symptoms; however, the caseworker observed Plaintiff to be "very paranoid." Plaintiff also told the case manager, "you can sit there

9

with your smug little face and pretend you don't come in my house when I'm gone, and you don't put stuff in my food, when I know that you do." *Id.*

The next month, Dr. Toca noted Plaintiff was irritable, argumentative, not interested in treatment, and left the room in the middle of the session "after not getting any negative response to his behavior." *Page ID#* 477.

Dr. Toca completed a Mental Functional Capacity Assessment form for the Ohio Department of Job & Family Services on October 3, 2008. *Page ID#* 463-64. According to Dr. Toca, Plaintiff was extremely limited in most mental work-related activities, including the ability to: work in coordination with or proximity to others without being distracted by them; complete a normal workday/work week without interruptions from psychologically based symptoms and perform at a consistent pace without unreasonable breaks; accept instructions and respond appropriately to supervisors' criticism; get along with others without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior. *Page ID#* 463. In addition to being "very argumentative, easily irritated, paranoid, and suffer[ing] from delusions," it was also reported that Plaintiff could "not get along with anyone, and does not respond well to any feedback." *Page ID#* 464. Dr. Toca concluded that Plaintiff was unemployable for at least 12 months. *Id.*

Dr. Toca reported that Plaintiff was demeaning on December 30, 2008. *Page ID#* 467. On March 24, 2009, he told Dr. Toca he was "doing fine." *Page ID#* 623.

10

Dr. Toca completed another Medical Functional Capacity Assessment form on July 29, 2009.  *Page ID#* 626.  Dr. Toca reported that Plaintiff was significantly limited in his ability to perform many work-related activities.  He was markedly limited in his ability to work in coordination with/proximity to others without being distracted by them; complete a normal workday/workweek without interruptions from psychological symptoms; accept instructions and respond appropriately to supervisors' criticism; work within a schedule, and maintain regular attendance.  *Id.*  Dr. Toca concluded that Plaintiff was unemployable for at least 12 months.  *Id.*

### Carl Tishler, Ph.D.

On February 13, 2007, psychologist Carl Tishler, Ph.D., reviewed the record for the Ohio Bureau of Disability Determination. *Page ID##* 320-43.  Dr. Tishler noted that Plaintiff "appears to be improving on medication."  *Page ID#* 323.  According to Dr. Tishler, Plaintiff should be "able to sustain well-learned tasks in relatively static, familiar environment, in which he is only required to interact superficially with others." *Id.* Aracelis Rivera, Psy.D., another state agency reviewing psychologist, affirmed Dr. Tishler's findings on April 10, 2007. *Page ID#* 340.

### Statements from Plaintiff's mother, and legal guardian, Barbara J. Purvis

On March 22, 2007, Plaintiff's mother, and legal guardian, Barbara J. Purvis, completed a third party function and symptom report.  *Page ID#* 249-64.  Shortly after Plaintiff's second hospitalization in the Psychiatric Unit at Good Samaritan Hospital, a Montgomery County, Ohio, Probate Judge found Plaintiff to be an incompetent person

and that guardianship was necessary. *Page ID##* 187-88. As such, on November 9, 2006, Mrs. Purvis was appointed as the indefinite, non-limited guardian of Plaintiff's person and estate. *Page ID##* 186-188.

Mrs. Purvis reported that she and her husband visited Plaintiff's house weekly to pick up his bills and give him grocery money. Plaintiff refused dinner invitations because he "does not trust people to fix his food, or water." *Page ID#* 249. Mrs. Purvis noted that Plaintiff has no contact with any friends or family, and at times, he dressed inappropriately. *Page ID#* 250. Plaintiff exercised obsessively, as he wanted to "stay strong," since he thought the FBI watched him. *Page ID##* 253, 261. Plaintiff was rigid and needed to do the same thing every day, in the same way. For example, a changed doctor's appointment, or just the need to leave home, were stressful and upsetting changes to his routine. *Page ID##* 255-60, 500-01. Plaintiff lost jobs in November 2001 and November 2005, because he thought co-workers were tampering with his food and drink, and disturbing the machine he worked on. *Page ID##* 255, 263.

## III. <u>Administrative Review</u>

### A. <u>"Disability" Defined</u>

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §§ 423(a), (d), 1382c(a). The definition of the term "disability" is essentially the same for both DIB and SSI. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). A "disability" consists only of physical or mental impairments that are both "medically determinable" and severe enough

to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability. *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

## B. Social Security Regulations

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence, *see Page ID## 54-55, see also* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

### C.    ALJ Armstead's Decision

At Step 1 of the sequential evaluation, ALJ Armstead found that Plaintiff has not engaged in substantial gainful activity since November 18, 2005, the alleged onset date. *Page ID#* 56.

The ALJ found at Step 2 that Plaintiff has the severe impairments of bipolar disorder, mixed; history of substance abuse in reported remission. *Id.*

At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner's Listing of Impairments. *Page ID#* 61.

At Step 4, the ALJ concluded that Plaintiff retained the residual functional capacity[6] (RFC) to perform the full range of work at all exertional levels subject to the following additional non-exertional limitations: consistent and fairly static tasks and work environment that includes occasional-to-less work setting and work routine changes; and occasional-to-less and superficial contact with other persons. *Page ID#* 62.

The ALJ concluded at Step 4 that Plaintiff was unable to perform his past relevant work as a computer-operated cutting machine operator, surface grinder operator, external grinder operator, and internal grinder set-up operator. *Page ID#* 66.

---

[6] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.  20 C.F.R. § 404.1545(a); *see Howard v. Comm'r of Social Security*, 276 F.3d 235, 239 (6th Cir. 2002).

At Step 5, based on the vocational expert's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform given his age, education, work experience, and RFC. *Page ID#* 67.

The ALJ's findings throughout his sequential evaluation led him to ultimately conclude that Plaintiff was not under a disability, and was therefore not eligible for DIB or SSI. *Page ID#* 67.

## IV. <u>Judicial Review</u>

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Social Security*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Social Security*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . " *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry – reviewing for correctness the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.  <u>Discussion</u>

### A.  <u>The Parties Contentions</u>

Plaintiff contends that the ALJ erred by accepting the opinion of a non-examining, reviewing psychologist, Dr. Tishler, over the opinions of Plaintiff's treating psychiatrist Drs. Todd and Toca, and treating psychologist, Dr. Weber.  Plaintiff reasons, in part, that the ALJ failed to weigh the treating physicians' opinions as required by the Regulations.

The Commissioner maintains that the ALJ properly evaluated the medical source opinions of record and correctly found that the treating physicians' opinions were unsupported by objective clinical findings and inconsistent with other substantial evidence of record.

### B.  <u>Medical Source Opinions</u>

#### 1.  <u>*Treating Medical Sources*</u>

The treating physician rule, when applicable, requires the ALJ to place controlling weight on a treating physician's or treating psychologist's opinion rather than favoring the opinion of a nonexamining medical advisor or a one-time examining physician or psychologist or a medical advisor who testified before the ALJ. *Blakley,* 581 F.3d at 406 (6th Cir. 2009); *see Wilson*, 378 F.3d 541, 544 (6th Cir. 2004). A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record. *Blakley,* 581 F.3d at 406 (6th Cir. 2009); *see Wilson*, 378 F.3d at 544.

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544). More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. § 404.1527(d)(1). Yet the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p. Consequently, opinions

of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization. *See* 20 C.F.R. § 404.1572(d), (f); *see also* Ruling 96-6p at *2-*3.

### 2. *Non-Treating Medical Sources*

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180 at *2. Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source. *See id*. at *2-*3. The Regulations explain, "[i]n deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. §404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 404.1527(d) including, at a minimum, the factors of supportability, consistency, and specialization. *See* 20 C.F.R. § 404.1572(f); *see also* Ruling 96-6p at *2-*3.

### C. **Analysis**

The ALJ based his assessment of Plaintiff's RFC on "the degree of restrictions substantially and reasonably supported by the medical record evidence and any credible testimony." *Page ID#* 65. The ALJ rejected the opinions of Drs. Toca, Weber, and Todd, because their conclusions were determined to be, "neither well supported by medically acceptable clinical and laboratory diagnostic techniques nor consistent with other

substantial evidence in the case record." *Page ID#* 59. The ALJ also noted that "[w]ith appropriate treatment (including psychotropic medication) the claimant's symptoms are effectively controlled and his condition is improved." *Id.*

In this case, the ALJ committed an error of law when he failed to evaluate Drs. Toca, Weber, and Todd's assessments in accordance with Sixth Circuit precedent, and Social Security regulations, and give "good reasons" for rejecting the treating psychiatrist's and psychologist's opinions. Here, it is unclear from the ALJ's decision if he accepted or rejected Drs. Toca and Weber's findings relating to Plaintiff's ability to work in coordination with/proximity to others without being distracted by them; accept instructions and respond appropriately to supervisors' criticism; get along with others without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and work within a schedule; and maintain regular attendance. The ALJ's statement that "[w]hen [Plaintiff] maintains compliance with treatment recommendations and when he refrains from abusing drugs and alcohol, [Plaintiff] is able to function effectively and to an extent that would permit him to perform some types of competitive employment," *Page ID#* 59, does not clearly indicate whether such limitations were in fact rejected, and if so, the rationale for that determination. The fact that such limitations may not affect a claimant's ability to perform unskilled work as outlined in his RFC assessment is not a proper basis for rejecting a treating physician's findings under the Social Security Regulations. *See* 20 C.F.R. § 404.1527(d)(2) (providing a number of factors which must be considered if the treating source opinion is not given controlling

19

weight including the length of the treatment relationship, the nature and the extent of the treatment relationship, the supportability of the opinion, its consistency with the record as a whole, the specialization of the treating source, and other factors). Thus, although the ALJ stated that he cannot give "controlling, or even deferential weight" to Drs. Toca, Weber, and Todd's opinions in formulating Plaintiff's RFC, the ALJ failed to give "good reasons" for rejecting and/or omitting certain limitations provided by Drs. Toca, Weber, and Todd's opinions to enable this Court to conduct any meaningful review of the decision. *See Wilson,* 378 F.3d at 544 ("a decision denying benefits 'must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (1996))).

More importantly, applying the requisite factors, it appears that Drs. Toca, Weber, and Todd's assessments should have been afforded great weight and incorporated into Plaintiff's RFC assessment. The Social Security regulations recognize the need for longitudinal evidence in mental impairment cases, and that an individual's level of functioning may vary considerably over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1 (D)(2). Since the level of functioning at any specific time may seem relatively adequate or, conversely, rather poor, proper evaluation of Plaintiff's mental impairments must take

into account variations in levels of functioning in determining the severity of his impairments over time. *Id.*

The ALJ overlooked that Drs. Toca, Weber, and Todd's records identified many symptoms indicative of bipolar disorder, including, acting paranoid, delusional, irritable, confrontational, argumentative, and challenging, as well as resisting treatment or "any feedback." *Page ID##* 464, 467-77, 480. Plaintiff "made several statements indicative of paranoid, delusional thinking," and displayed poor insight. *Page ID#* 457. Even at the hearing Plaintiff informed the ALJ he only hallucinates "when people put drugs in [his] food," *Page ID#* 94; that people have been doing things to his house for years, for example, "somebody leaves [his] . . . front door open so that [he] know[s] that somebody has been in [his] house," *id.*; and that he "can only assume . . . the government [has] installed cameras in his house," although he "do[es]n't know if it's in the TV or where . . . ." *Page ID#* 99.

When mental work abilities are at issue, such symptoms constitute supporting medical or objective evidence. As the United States Court of Appeals for the Sixth Circuit has explained:

> In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices ... in order to obtain objective clinical manifestations of mental illness.... [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic

techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (quoting *Poulin v. Bowen*, 817

F.2d 865, 873-74 (D.C. Cir. 1987)(other citation omitted)).

Turning to Dr. Tishler, the ALJ relied on this non-treating reviewing psychologist

to support his assessment of Plaintiff's RFC. In doing so, the ALJ erred by not evaluating

Dr. Tishler's opinions under the required legal criteria. *See Page ID##* 57, 59-61. The

ALJ thus failed to comply with the Commissioner's Regulations, which required the ALJ

to evaluate the opinions of non-treating medical experts under the same regulatory factors

– supportability, consistency, specialization, *etc*. – that apply to treating medical source

opinions. *See* Soc. Soc. Ruling 96-6p, 1996 WL 374180 at *2-*3 (interpreting, in part, 20

C.F.R. § 404.1527(f)).

In summary, the three medical sources who had the most contact with Plaintiff,

Drs. Toca, Weber, and Todd, all concluded that Plaintiff was disabled. Their opinions

were supported by other examining mental health specialists. For example, when

admitted to the hospital, Plaintiff had a "questionable value of ideas," poor

insight/judgment, irritable affect, and illogical thought processes. *Page ID##* 278, 407-

08. In May 2007, treating psychiatrist, Dr. Wee, noted Plaintiff was irritable, tense, and

continued to display paranoid thoughts. *Page ID#* 498. Case managers at Eastway

reported that Plaintiff was hostile, argumentative, confrontational, angry, and paranoid.

*Page ID#* 489, 478. On September 5, 2008, Plaintiff accused his case manager of

tampering with his food, when he was not at home. *Id.*

Accordingly, for all the above reasons, Plaintiff's challenges to the ALJ's decision are well taken.[7]

## VI.  Remand For Payment of DIB and SSI is Warranted

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is warranted in the present case because the evidence of disability is either overwhelming or strong while contrary evidence is weak.  *See Faucher*, 17 F.3d at 176.  This is so in light of the consistent opinions provided by Drs. Toca, Weber, and Todd, while the only contrary opinion was provided by Dr. Tishler, and later affirmed by Dr. Rivera, both non-examining, non-treating, record-examining psychologists.  Drs. Toca, Weber, and Todd all completed Mental Functional Capacity Assessments indicating Plaintiff was unemployable for 12 months or longer.  *Page ID##*

___

[7]Because of this conclusion, an in-depth analysis of Plaintiff's remaining challenge to the ALJ's decision is unwarranted.

23

385-86, 440-41, 463-64, 626.  All of these assessments found Plaintiff with, at least, moderate limitations in many of his abilities, with two assessments largely indicating Plaintiff's abilities were markedly limited or extremely limited.  *Page ID##* 440-41, 463-64.  In fact, even Dr. Tishler found Plaintiff moderately limited in a number of areas, including Plaintiff's ability to: complete a normal work-day and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; and, accept instructions and respond appropriately to criticism from supervisors.  *Page ID##* 321-22.

The vocational expert acknowledged during examination by Plaintiff's counsel that even though he believed there were approximately 48,300 jobs available to a hypothetical individual with Plaintiff's work limitations in the heavy strength and medium strength range, without exertional restrictions, but which had tasks that were consistent, not much change in the job, and a fairly static work environment with occasional to less work setting or work routine changes, and superficial contact with others, co-workers, supervisors, and the public, *Page ID##* 122-23, not one of these jobs could be performed if the individual was not able to do all the following:

- respond to criticisms;

- accept instructions;

- consistently get along with a supervisor;

- not cause problems;

- make simple work related decisions;

24

- ask simple questions;

- request assistance; and,

- complete a normal workday and workweek without any interruptions from psychologically based symptoms at a consistent pace without an unreasonable number and length of rest periods.

*Page ID##* 123-26. In fact, according to the vocational expert, "the third most popular reason people are terminated is they can't get along with co-workers or supervisors." *Page ID#* 126.

In this case, the evidence is strong, if not overwhelming, and contrary evidence weak, that Plaintiff, due to his bipolar disorder and resulting paranoia and delusional thinking, is extremely limited in his ability to act in many, if not all, of the above-mentioned ways. Without these abilities, which the record shows the Plaintiff substantially lacks, the vocational expert has already acknowledged that no jobs would be available for a hypothetical person with the same age, education, and work experience as Plaintiff. *Page ID##* 123-26. In addition, no factual issues remain to be resolved in this case, and therefore a remand for further evidence is unnecessary. The evidence conclusively establishes that Plaintiff has been under a "disability" since his alleged onset date of November 18, 2005. *Page ID#* 86.

Accordingly, the case should be remanded to the Commissioner for payment of SSI and DIB.

**IT IS THEREFORE RECOMMENDED THAT:**

1. The Commissioner's non-disability finding be reversed;

2.      This matter be remanded to the Social Security Administration for the payment of benefits consistent with the Social Security Act; and,

3.      The case be terminated on the docket of this Court.


January 13, 2012                                  _____s/Sharon L. Ovington_____
                                                           Sharon L. Ovington
                                                  United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen (17) days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).